Francisco **OTERO** et al., Plaintiffs,

v.

**NEW YORK CITY HOUSING AU- THORITY** et al., Defendants.

**No. 72 Civ. 1733.**

United States District Court,
S. D. New York.

Feb. 8, 1973.

Nancy E. Leblanc, MFY Legal Services, New York City, for plaintiffs.

Otto M. Bonaparte, New York City Housing Authority, New York City, Whitney North Seymour, Jr., U. S. Atty., New York City, for defendants George Romney and Department of Housing and Urban Development.

Kalman Finkel, The Legal Aid Society, New York City, Marcel Weber, National Jewish Commission on Law and Public Affairs, Brooklyn, N. Y., for intervenors.

## OPINION

LASKER, District Judge.

One out of every 15 or 16 people in the City of New York—a total of 550,000 persons—lives in public housing.[1] In periods of urban decay and housing shortage such as have existed almost continuously since the end of World War II, and particularly in recent years, the allocation of available public accommodations has been of acute concern to low income families looking for a decent place to live. If the supply of public housing was ever sufficient in the post-war era, it certainly has not been adequate to meet the aggravated demand caused by rapid and largely unforeseen migration to the city of poor persons for whom the cost of privately constructed housing is beyond their means.[2]

█ The decision as to who should be entitled to the benefit of public housing has, therefore, become as important as the location and number of units to be built. The situation has been complicated by radical changes in the racial make-up of the cities. As the percentage of black and Puerto Rican citizens in the urban population has grown and ghettos have unhappily enlarged, local authorities and Congress itself have understandably concluded that for the good of the entire community, racial balance should be one—though not the sole—objective of allocation.

In the Fair Housing Act of 1968, Congress declared (42 U.S.C. § 3601):

"It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."

and directed (42 U.S.C. § 3608(d)(5)) that:

"(d) The Secretary of Housing and Urban Development shall—

* * * * * *

(5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter."

These statutory provisions have been universally construed by court decisions (referred to in detail below) to require housing authorities not merely to follow a policy of "color blindness", but literally to act affirmatively to achieve fair housing, that is, not merely to desegregate, but to integrate housing.

In the case before us, the plaintiff and intervening-defendant classes are cross-claimants for a limited number of apartments in the Seward Park Extension Urban Renewal Area. Defendant New York City Housing Authority is the builder and manager of the project, and George Romney is sued in his then capacity as Secretary of the Department of Housing and Urban Development ("HUD"), which has financially assisted the urban renewal project. They support the claims of the intervening defendants.

---

1. N.Y. Times, Jan. 10, 1973, at 66.

2. Some indication of the public housing shortage is given by the fact that in 1972 there were 147,000 eligible applicants on the waiting list for public housing apart-

ments compared with a Housing Authority placement capacity of approximately 10,000 a year. Golar affidavit in opposition to application for a preliminary injunction, par. 11.

All parties have moved for summary judgment,[3] and all factual questions have been resolved either by agreement of the parties, as documented in the papers submitted by them, or by an evidentiary hearing as to certain limited issues.

Before outlining the complex and multi-layered statutory and constitutional arguments made by either side, the history of the battle must be sketched.

## I.

The Seward Park Extension Urban Renewal Area is a complex of middle and low income housing constructed with the aid of federal funds on Manhattan's Lower East Side under the supervision of the New York City Housing and Development Administration ("HDA"). Of the low income buildings, two are to be constructed and managed by the New York City Housing Authority. They are the subject of the dispute here.

Title to the urban renewal area vested in the City of New York on November 1, 1967. Gradually over the following years, HDA demolished the existing structures in the area and relocated their inhabitants into various types of accommodations throughout the city. The majority of those relocated were rehoused in public housing in the Lower East Side area. These persons were assured, during the relocation process, that they would have a first priority to return to the buildings completed on the site of their former homes.

Arrangements for the leasing of apartments in the two buildings, one of which is now complete, the other to be completed within a couple of months, began in January, 1972. At that time, HDA sent notices to all former site occupants, without regard to whether they were project or urban renewal site residents [4] or resided in standard or substandard housing, informing them of their "first priority to return," subject to qualifications as to income, family size and the like. Pursuant to this notice, many former site occupants applied for and were granted leases. At some point in the spring, however, the Housing Authority began informing other former site occupants that all the apartments were filled and commenced leasing apartments to defendant-intervenors.

In April, 1972, plaintiffs moved for preliminary relief. The late Judge McLean granted a temporary restraining order barring the Housing Authority from renting apartments to anyone other than members of the plaintiff class (former site occupants). On May 23, 1972, Judge Frankel, on a motion for a preliminary injunction, filed an extensive opinion, reported at 344 F.Supp. 737, holding (1) that the Housing Authority's actions in renting apartments to persons other than members of the plaintiff class violated the Authority's own regulation,[5]

3. Plaintiffs seek to enjoin the Housing Authority 1) from leasing apartments in the Seward Park buildings or from allowing leased apartments to be occupied until their priority to return has been satisfied; 2) from leasing apartments in a discriminatory fashion. They also seek a declaratory judgment that the leases entered with non-former site occupants are null and void. As to HUD and Romney, plaintiffs seek to enjoin them to ensure that the Housing Authority ceases and desists from racial discrimination in the rental of apartments and follows its regulation according plaintiffs a first priority to the apartments. All the defendants (including intervenor-defendants) seek summary judgment dismissing the complaint.

4. Families relocated from the urban renewal area will henceforth be called "urban renewal site residents", while those who resided on the site of the project will be termed "project site residents". When both groups are referred to together, the general term "former site occupants" will be used.

5. The policy of the Authority is established by its three members in the form of resolutions. Broad policy determinations are translated into staff directives as general memoranda, called "GMs," issued by the Director of Management. Testimony of Irving Wise, Director of Management of the Housing Authority, transcript at 16–17. Finally, there are standard procedures, called "SPs," which are issued

GM 1810, and thereby deprived plaintiffs of due process; and (2) that, in renting apartments on a priority basis to Jewish tenants, the Authority violated the Establishment Clause of the First Amendment, the Equal Protection Clause, and (because the action disobeyed the anti-discrimination clauses of 42 U.S.C. §§ 2000d and 3604) the Supremacy Clause of the Constitution.[6]

█ On June 23, 1972, Judge Gurfein filed an order permitting intervention as defendants of Akiva Miller and others similarly situated, persons who are not former site occupants, but who have been given leases or commitments for apartments in the project. These persons had not been originally named as parties and had not appeared or been represented in the litigation as to preliminary relief.[7]

## II.

In order to clear the area for urban renewal, 1,852 families were relocated, 802 into public housing. Of the 1,852, fifty-five families resided on the actual site of the Housing Authority buildings. Thirty-two of these were relocated into public housing.

When leasing time for the new buildings came, 161 of the former site occupants were given leases, while 322 applied and were refused. Of the project site residents, 15 have leases and 40 have applied and been turned down. Accordingly, of a total of 360 apartments, 161 went to former site occupants (i. e., families who formerly resided either within the area or the project) and 2 were leased to resident employees. These are not contested. Of the 197 remaining contested apartments, 26 have not been rented and 171 have been leased to defendant-intervenors.

As a result, the plaintiff class numbers 322, of whom 40 are project site residents and 282 are urban renewal site residents. Of the total, 260 reside in public housing (32 project and 228 urban renewal site residents). The intervenor-defendants' class contains 171 members, 97 of whom reside in public housing. Forty-eight of the intervenors are persons transferred from other projects to be close to their place of worship (hereinafter called "house of worship transferees").

Finally, we turn to the racial statistics, which, unfortunately, play a large part in the decision of this case. Sixty percent of the 1,852 urban renewal site residents are non-white [8] (including 49 of the 55 project site residents). As the leases presently stand, 119 or 36% have gone to non-whites and 215 or 64% to whites. Former site occupants lessees (161 leases) are 60% non-white and 40% white. Defendant-intervenors, with 171 leases, are 12% non-white and 88% white.

The evidence establishes that if plaintiffs prevail the Housing Authority buildings will be 80% non-white by fam-

---

by the Department of Management. All of the above are henceforth called "regulations".

6. Judge Frankel's decision was implemented by an order dated June 8, 1972.

7. Intervenor-defendants have moved for a class action determination. As noted above, the proposed class numbers 171 members; therefore, joinder is impracticable. Korn v. Franchard Corp., 456 F.2d 1206, 1209 (2d Cir. 1972). There are questions of law common to the class as a whole and the claims of the representative parties are typical of the claims of all. Furthermore, the representative parties and their counsel have and will no doubt continue ably to protect the inter-

ests of the class. Finally, "adjudications with respect to individual members of the class . . . would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests." Rule 23(b)(1)(B), Fed.R.Civ. P. Accordingly, the requirements of Rule 23(a) and (b)(1)(B) having been met, the motion for a class action determination is granted.

8. Judge Frankel and plaintiffs have defined non-white to include Puerto Ricans, who make up a majority of the plaintiff class. 344 F.Supp. at 742, n. 3. We adopt this definition.

ily. If defendants carry the day, the ratio will be 40% non-white to 60% white by family and 50% non-white and white by population. As background to the above, it is noteworthy that the entire urban renewal complex, of which the Housing Authority buildings are only a part, will have the following racial composition by family: If plaintiffs prevail, 27% non-white to 73% white; if defendants win, 18% non-white to 82% white. In sum, the ratios are:

| | Project | | Urban Renewal Area | |
| | If plaintiffs prevail | If defendants prevail | If plaintiffs prevail | If defendants prevail |
| (by family) | | | | |
|---|---|---|---|---|
| white | 20% | 60% | 73% | 82% |
| non-white | 80% | 40% | 27% | 18% |

Thus, the potential impact of this decision on the racial mix of the urban renewal area as a whole is less drastic than the truly major consequences it will have for the parties and on the population make-up in the two contested buildings.

### III.

On the present counter-motions for summary judgment, plaintiffs contend (1) that the Authority's regulation, GM 1810, was in effect at all relevant times and grants plaintiffs a right of first refusal to project apartments, whether they are already housed in public housing or not; (2) that the Authority's action violates due process in not following its own regulations; (3) that the Authority's action (and HUD's inaction) is racially discriminatory as to plaintiffs and thus contravenes the Equal Protection Clause and relevant statutes; and (4) that the Authority's action (and HUD's inaction) violates the Establishment Clause of the First Amendment.

The defendants and intervenor-defendants variously argue that (1) requiring the Authority to give first priority to the plaintiff class of former site occupants would create a racial imbalance in the project contradictory to constitutional, legislative and federal regulatory requirements; (2) that the Authority's regulation, GM 1810, which was promulgated after the Authority took title to the project area, does not apply to the project; that if it does, it does not, construed in the light of its history, require that first priority be given to the plaintiffs; and that if it does, it is unconstitutional as failing to carry out the Congressional mandate of affirmative action to maintain or create balanced communities; (3) that the Authority, as an administrative agency, must be allowed sufficient flexibility to achieve a stable cultural economic, racial and social mix of tenants with which the court should not interfere; (4) that the court should, in accord with accepted principles of administrative law, uphold the Authority's interpretation of its own regulation; (5) that, as to the proposed allotment of apartments to Jewish citizens, the proximity to their place of worship is a legitimate governmental concern which does not infringe on the Establishment Clause; and (6) that, in any event, relevant statutory provisions (42 U.S.C. § 3612(a)) bar the court from interfering with the rights of the intervening defendants who have already been granted leases.

Romney and HUD separately assert, as to themselves, (1) that because they have attempted to ensure that the project would be racially integrated, and have not participated in the Authority's allegedly discriminatory acts, there is no basis for enjoining their future conduct; (2) that HUD's endorsement of the argument that the Authority's regulations should be nullified as violative of the Equal Protection Clause does not

constitute discrimination against the plaintiffs and (3) that plaintiffs' failure to utilize HUD's complaint procedure bars their action against the Federal defendants.

In reply to these defenses, plaintiffs take the position that (1) adherence to the Authority's regulation giving first priority to former site occupants is not unconstitutional as an interference with the Congressional mandate to integrate public housing; and (2) that the court has the power, under the Fair Housing Act of 1968, to invalidate the leases of the intervening defendants, and that in any event the leases are contractually insufficient and unenforceable.

## IV.

Before confronting the crucial issue of the constitutionality of the regulation on which plaintiffs rely, it is necessary to determine what regulation applies and what its meaning is.

Although title to the property involved in this dispute vested in the City of New York on November 1, 1967, plaintiffs rely on a regulation governing former site occupant priority which went into effect on August 14, 1968. Defendants argue that the regulation which was in effect when the City acquired the property should apply.

The earlier regulation (GM 1282, exhibit 3 to Golar affidavit opposing motion for summary judgment), relied on by defendants, gave top priority without regard to housing need to project site residents. Second and third priorities were accorded neighborhood residents (living within a radius of one mile of the project) and families about to be displaced by government action (including urban renewal), if they met the need requirement for eligibility. The later regulation (GM 1810, appended to Judge Frankel's opinion, 344 F.Supp. at 748), upon which plaintiffs rely, expands the definition of "site resident," to whom the top priority is given, to include not only project but urban renewal site residents.

It may be that the Housing Authority could have treated the earlier regulation as controlling, if it had done so consistently and with due notice to those affected by it. However, it could reasonably have looked, as well, to the regulation which was in effect either when relocation took place or when invitations to return were sent out. Since most, if not all the plaintiffs appear to have been relocated and since certainly all the invitations to return were sent out after the change in regulations, it would be reasonable to apply the later regulation, and indeed the Housing Authority, in conjunction with HDA, has acted consistently as if it did apply. It is clear from the testimony of Beverly Bronseaux, Assistant Chief of the Tenant Selection Division of the Housing Authority, Ernesto Martinez, Director of the Grand Street Settlement House, and plaintiffs, Francisco Otero and Candido Guevara, at the evidentiary hearing on the motions (transcript at 125–28, 134–41, 138–39, 143, 151–152) and the affidavits of named plaintiffs in support of the motion for a preliminary injunction that everyone involved in the relocation process understood that residents from the entire urban renewal area were to be invited to return. Since under the earlier regulation only project site residents were sent invitations, this fact indicates that the later regulation was applied after its adoption in 1968. We hold that the Housing Authority must abide by its choice, but in doing so we are not deciding that the later regulation must be given generally retroactive application. We merely hold that, in the circumstances of this case, it governs the Housing Authority's actions, since they were taken after the later regulation's adoption and innocent persons have relied on representations that it would be applicable. Accordingly, we find the applicable regulation to be GM 1810.

To achieve the stated purpose of providing objective criteria for the allocation of public housing according to "urgency of housing need", GM 1810 gives six categories of persons a priority

in admission to public housing. The first of these is former site occupants. The juxtaposition of the preamble, which speaks in terms of housing need, and the first priority, which discusses "site residents" without regard to need, can be read as indication that need is a threshold requirement which must be met before the question of priority even comes into play. This interpretation of its own regulation is strenuously urged by the Housing Authority. On the other hand, the language of GM 1810 is also consistent with the position advanced by plaintiffs, namely, that former site occupant status confers an *exemption* from the requirement that an applicant to public housing demonstrate "urgency of housing need." The ambiguity of the regulation makes it necessary to look beyond its text for clearer indications of its meaning. A number of factors lead us to conclude that plaintiffs have advanced the better interpretation.

First, the history of the priority universally accorded former site occupants before the tenanting of this project buttresses plaintiffs' argument that former site occupant status was an exception to normal eligibility rules. As noted above, GM 1810's predecessor (GM 1282), in effect from 1961 to 1968, gave a first priority to families residing on the site of the housing project (project site residents). As to this group, "[t]he requirement that an eligible applicant for a federally-aided project must be a family living in unsafe, insanitary or overcrowded housing did not apply." (Affidavit of Simeon Golar, Chairman of the Housing Authority, opposing motion for summary judgment, par. 10) The "site resident" was treated as an exception to usual eligibility requirements because of the unfairness of depriving relocatees of the opportunity of returning to their home neighborhood. As Irving Wise, Director of Management of the Housing Authority, stated during the evidentiary hearing on the motions:

"The philosophy was that here Government was going in, disturbing a possession, an occupancy held by these people, through no fault of their own. They were being relocated. We felt that simple social justice and fairness should not, because they were relocated to decent housing, disqualify them from coming back to the site from which they were dislocated in the first instance. And so, they retained their eligibility to return, although they did not meet the requirement that they be in need of public housing." Transcript at 15.

Other considerations favoring this approach come readily to mind, such as promotion of community stability and facilitation of clearing the project area by voluntary relocation.

In 1968, the definition of site resident was expanded by GM 1810 to include *urban renewal* relocatees, because there seemed to be no rational justification for distinguishing between members of the two groups. Irving Wise, the Housing Authority's Director of Management, stated that when the Authority began to build more projects in urban renewal areas:

"the conclusion was that it would be unfair to accord a right to somebody who happened to be living on one parcel of land and not to accord a similar right to somebody who happened to be living across the street in the same urban renewal area, particularly when we consider that sometimes when we acquire, when the city acquired an area we didn't even know then which parcels would be public housing and which might be some other form of renewal. So that we felt it was confusing and unfair to continue this situation. Therefore, it was decided to abolish the distinction and to afford the same rights to those who lived in the entire urban renewal area." Transcript at 26.

Whether the Housing Authority intended to give the expanded group the benefit of the exemption from showing housing need accorded former site residents or to require such a showing of the entire group, including those previously

exempt, was never formally clarified. In practice, however, the Housing Authority continued to act as it had before changing the regulation; that is, it continued to tell *all* former site occupants that they were entitled to return on a priority basis to the new project.

Under GM 1282, all "site residents" were invited by letter to return to the completed projects. The same practice was continued under GM 1810, except that letters were sent out to the larger group covered by the new regulation. No distinction was made between persons living in public housing and those who were, or might be living in substandard housing. In fact, the actual letter mailed to the plaintiff class in this case contained specific instructions for those recipients who were transferees from other projects.[9] Admittedly, the letters were sent out by HDA, which was in charge of relocation, and not the Housing Authority itself. It is clear, however, that HDA's action was not the result of a misunderstanding between it and the Housing Authority, but that in practice both understood this to be the proper procedure. Beverly Bronseaux, who for more than four years has been the Assistant Chief of the Tenant Selection Division of the Housing Authority, who oversees the information office of the Division and whose duty it is to interpret the Authority's regulations to the public, testified that, as of 1968, all former site occupants were eligible to return on a top priority basis, regardless of whether they resided in public housing or in substandard housing, that the need requirement was waived in their case, and that this is what his office informed the public. (Transcript at 125–28.) Furthermore, Ernesto Martinez, Director of the Grand Street Settlement House, who was authorized by the Authority to advise tenants of their relocation rights, testified that he was regularly in contact with Housing Authority officials at all levels and that he was consistently told until April, 1972, (in one case even by a member of the Authority itself) that relocatees would have a right to return even if they had been relocated into public housing. (Transcript at 133–35.)

Thus, the history and application of GM 1810 raise serious doubts as to the validity of the Housing Authority's recent interpretation of its regulation. Two other factors point overwhelmingly to the conclusion that the Authority's interpretation is simply inconsistent with the realities of the situation.

The first of these is another regulation [10] of the Housing Authority, SP 047: 48: 4 (exhibit F to Golar affidavit opposing application for preliminary injunction), last revised on August 1, 1967. This regulation, governing tenant transfers from one project to another, lists among the "Prescribed Reasons for Which Transfer Requests May Be Approved" the following:

> "4.  Former Site Occupant
> Former site occupants who were rehoused in a project shall receive preference in transferring back to the project built on the site."

The plain language of this regulation expresses the policy which the Housing Authority consistently followed in tenanting new housing projects, that is, to accord transferees the same priority in returning as other relocatees. *See* testimony of Beverly Bronseaux, transcript at 126. It is impossible to reconcile this regulation with GM 1810, unless the latter grants former site occupants a priority without regard to "urgency of housing need."

Finally, GM 1810 must be read in conjunction with the requirement contained in 42 U.S.C. § 1455(c)(1) that persons displaced by the construction of federally-funded housing projects be relocated into "decent, safe and sanitary dwellings." Assuming that the Housing Au-

---

9.  The letter read:
    "Persons who already live in public housing must apply for a transfer at the management office of their present project and advise this field office at 376 Grand Street of their intention."  344 F.Supp. at 741.

10.  *See* n. 5, *supra*.

thority abides by this section, as it must and does, it is apparent that, if the priority accorded former site occupants is contingent on their demonstrating that they live in substandard housing, it and the regulation from which it derives are meaningless for all practical purposes.

■ The Housing Authority argues that, in order to achieve a stable composition of tenants in its projects, it is vested with broad discretion to choose tenants from differing cultural, economic, social and racial backgrounds. Its position on this—and on the related matter of the presumption of validity which is to be accorded an administrative agency's interpretation of its own regulations—is clearly correct,[11] but it is beside the point. The fact that the Authority *could* have adopted a regulation resulting in a vastly different racial composition than the present regulation will achieve and could perhaps have applied it in such a way as to exclude plaintiffs from the projects, if it had done so consistently and with due notice to all involved, does not alter the course which it in fact chose and on which plaintiffs have relied with reason. Having so committed itself, it cannot change horses in midstream to plaintiffs' detriment. Vitarelli v. Seaton, 359 U.S. 535, 539–540, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959).

Since we have concluded that GM 1810 grants plaintiffs a first priority in admission to the Seward Park Extension housing projects, it is necessary to determine whether the regulation, as applied here, is consistent with federal law.

## V.

Assuming that members of the plaintiff class exercise the right of first pri-

ority which we have found that the Authority's regulation grants them, the resulting racial mix of tenants in the project will be 20% white and 80% non-white.

Defendants argue that such a result would constitute "impermissible ghettoization" violating the Equal Protection Clause, the Civil Rights Act of 1871 (42 U.S.C. § 1983) and 1964 (42 U.S.C. § 2000d), the Fair Housing Act of 1968 (42 U.S.C. §§ 3601, 3604, and 3608(d) (5)) and, consequently, the Supremacy Clause (Article VI) of the Constitution.

Since, as all parties agree, the Fair Housing Act of 1968 sets the most stringent anti-discrimination standards, we proceed to determine whether the Authority's regulation, as we have construed it above, meets the test of that statute.

We start from the statutory language which, as earlier indicated, provides:

"It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States" (42 U.S.C. § 3601).

and further:

"(d) The Secretary of Housing and Urban Development shall—

\* \* \* \* \*

(5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." (42 U.S.C. § 3608(d) (5))

There is no doubt that this legislative command goes beyond constitutional and prior Congressional requirements and imposes new, positive responsibilities on those constructing or operating Federally assisted housing.

---

11. *See* Gautreaux v. Romney, 448 F.2d 731, 740 (7th Cir. 1971) and Shannon v. United States Dept. of Housing and Urban Dev., 436 F.2d 809, 818–819 (3d Cir. 1970) as to the broad discretion vested in HUD to carry out the policies of the Act. By federal law, local agencies are also vested with extensive discretion in the administration of housing programs. 42 U.S.C. §§ 1401 and 1441. We do not question that such administrative discretion, when carried out with the fair-mindedness which is characteristic of the New York City Housing Authority (*see* 344 F.Supp. at 739), is an essential and desirable factor in promoting stable, integrated housing.

In a considered review of the history of this subject, the Court of Appeals for the Third Circuit has observed:

"Read together, the Housing Act of 1949 and the Civil Rights Act of 1964 and 1968 show a progression in the thinking of Congress as to what factors significantly contributed to urban blight and what steps must be taken to reverse the trend or to prevent the recurrence of such blight. In 1949 the Secretary, in examining whether a plan presented by a LPA included a workable program for community improvement, could not act unconstitutionally, but possibly could act neutrally on the issue of racial segregation. By 1964 he was directed, when considering whether a program of community development was workable, to look at the effects of local planning action and to prevent discrimination in housing resulting from such action. In 1968 he was directed to act affirmatively to achieve fair housing. Whatever were the most significant features of a workable program for community improvement in 1949, by 1964 such a program had to be nondiscriminatory in its effects, and by 1968 the Secretary had to affirmatively promote fair housing." Shannon v. United States Dept. of Housing & Urban Dev., 436 F.2d 809, 816 (3d Cir. 1970)

. . . . . .

"Possibly before 1964 the administrators of the federal housing programs could, by concentrating on land use controls, building code enforcement, and physical conditions of buildings, remain blind to the very real effect that racial concentration has had in the development of urban blight. Today such color blindness is impermissible. Increase or maintenance of racial concentration is prima facie likely to lead to urban blight and is thus prima facie at variance with the national housing policy." Id. at 820–821.

In Shannon, plaintiffs sought to bar issuance by HUD of guaranty and rent supplement contracts in relation to proposed federally assisted housing on the grounds that the location of the proposed project on the site chosen would have the effect of increasing the already high concentration of low income black residents in the area. Thus, Shannon paralleled the case at hand in posing a situation in which the further concentration of low income black residents was attacked, but differed in that the target of the plaintiffs was the location of the proposed project, not (as here) the proposed mix of tenants in a given location. Indeed our research, and the voluminous material submitted by the parties to these motions, reveals no holding as to the meaning of the 1968 Act's affirmative obligation in regard to tenant make-up of either a ghetto or non-ghetto project.

Thus, although we altogether agree with the broad construction of the constitutional and statutory rights against discrimination set forth in Shannon and such other landmark cases as Gautreaux v. Romney, 448 F.2d 731 (7th Cir. 1971), and Crow v. Brown, 332 F.Supp. 382 (N. D.Ga.1971), aff'd, 457 F.2d 788 (5th Cir. 1972), to mention only the leading decisions, we find that they carry us only part of the way.

We agree, for example, with the Gautreaux court's holding (448 F.2d at 737) that, under the 1964 Civil Rights Act (applicable there—and here—in addition to the 1968 Housing Act), funding by HUD of segregated housing sites "cannot be excused as an attempted accommodation of an admittedly urgent need for housing with the reality of community and [Chicago] City Council resistance" to building low income housing outside the ghetto, and with the lower court's statement in a companion Gautreaux case (Gautreaux v. Chicago Housing Authority, 296 F.Supp. 907, 914 (N. D.Ill.1969)) that "a deliberate policy to separate the races cannot be justified by the good intentions with which other laudable goals are pursued." We are in complete sympathy too, with the firm and perceptive remarks of the court in Crow v. Brown, supra, a holding which,

like *Gautreaux,* barred the *location* of publicly assisted housing in an area which would have furthered the concentration of low income blacks. The *Brown* decision accurately observed:

> "For better or worse, both by legislative act [1964 Civil Rights Act, 42 U. S.C. § 2000d] and judicial decision, this nation is committed to a policy of balanced and dispersed public housing. . . . Among other things, this reflects the recognition that in the area of public housing local authorities can no more confine low-income blacks to a compacted and concentrated area than they can confine their children to segregated schools." 332 F.Supp. at 390 (citations and footnote omitted).

The factual complex in *Brown* bears striking similarities to the picture before us. As the population make-up of the Lower East Side of New York City has, in the instant case, changed since 1965 from 58.9% white and 41.1% nonwhite to a ratio, in 1970, of 48.3% to 51.7%,[12] so the mix of Atlanta's population had altered in *Brown* to a point where the court found that Atlanta would become a "black city with a solid white perimeter" unless drastic changes occurred (332 F.Supp. at 384). While the megalopolitan scale of the New York area lessens the likelihood of a segregated black city and equally segregated white suburbs, the threat even here is real and we do not doubt that under appropriate circumstances a local housing policy which deliberately situated white tenants in an area tending to become predominantly black[13] would be as valid and legitimate as a policy deliberately infusing black residents into predominantly white areas.

The difficulty is that neither this recognition nor our agreement both with the cases referred to above and the many others cited in the briefs of the parties solves the problem which the instant case presents: That is, whether the constitutional and statutory obligation of a Housing Authority to provide fair housing and balanced communities[14] *bars* it from granting former site occupants *who are members of minority groups* an absolute priority to public housing accommodations, if such a grant would tend to tip the racial balance in the area.

Defendants argue that to grant such a priority to former site occupants would violate the Housing Authority's statutory and constitutional obligation. The plaintiffs say this is a distorted reading of the law, and that, in any event, the community will be just as "integrated" if it is 20% white—as it would be if the plaintiffs prevail—as if it were 20% black.

In all of the major decisions to date, such as *Shannon, Gautreaux* and *Brown,* construing the 1968 Act, the plaintiffs, who were black in all cases, complained that HUD or the Housing Authority, as the case might be, was not taking affirmative action towards housing integration. The courts properly sustained those contentions. The posture of this case is different. Here the plaintiffs, largely blacks (and Puerto Ricans), do not contend that the Housing Authority's regulations do *not* con-

---

12. Golar affidavit in opposition to motion for summary judgment, par. 16.

13. We are cognizant of, and do not dispute the well accepted sociological theory of "tipping", which holds that there is a certain rough ratio between the races which must be preserved to prevent a white exodus, which proportion, if maintained, creates a stable, integrated community and, if "tipped" in favor of nonwhites, produces ghettoization. *See* Recent Cases—Shannon v. HUD, 85 Harv. L.Rev. 870, 875–76 (1972). The "tipping" phenomenon was a matter of con-

cern to the *Gautreaux* court. Note, Racial Discrimination in Public Housing Site Selection, 23 Stanford L.Rev. 63, 135–36 (1970). There is some indication in the record that the Lower East Side, although still integrated, may have commenced to "tip". Golar affidavit in opposition to motion for sumary judgment, par. 16. Certainly, the Authority has broad discretion to take affirmative action to reverse the trend.

14. Plaintiffs do not dispute that this is the Housing Authority's obligation.

form with its obligation under the 1968 Act. To the contrary, it is their position that the regulations are consistent with that obligation. It is the defendants who argue that, if the regulation is construed to give absolute priority to plaintiffs, it is inconsistent with the requirements of the 1968 Act, because the Act compels the Authority to achieve racially balanced communities, even if the accomplishment of that objective must be at the expense of blacks and Puerto Ricans. We cannot agree with this contention and do not believe that either the 1968 Act or the important holdings in *Shannon, Gautreaux,* and *Brown* (with which we agree) require affirmative action to achieve integration *at the expense of minority groups.*

The question here is one of first instance and there is only one source which can cast any light on the issue of Congressional intent: That is the expression of Congress itself. The legislative history is unfortunately sparse considering the importance of the subject. Nevertheless, a careful reading of the relatively extended remarks of the chief sponsor of the affirmative action clause, Senator Mondale, at 114 Congressional Record 3421*ff,* does seem to make it quite clear that the objective of the affirmative action clause of the 1968 Act was to benefit minority groups, particularly blacks, who, as the result of the nation's history of discrimination, had been prevented from securing decent housing. It is true that Senator Mondale's discussion accented the objective of making housing available to minority groups in non-ghetto areas and did not specifically treat the question before us. If it had, presumably, this litigation would not have been necessary.

Nevertheless, it would be ironical in the extreme to construe an Act of Congress, intended to make housing available to members of minority groups, in such a way as to deprive them of that very commodity. The statute should not be so construed unless it is clear on its face that that is the result which Congress intended—and it certainly is not—

or unless higher authority finds otherwise. No solution of the dilemma presented by this litigation can be easy or clear-cut. The arguments on both sides are weighty and remind us balefully of Justice Holmes' caveat that "hard cases make bad law."

■ We believe, nonetheless, that the clear intention of the sponsors was to benefit members of minority groups and that this contention tips the balance in favor of plaintiffs' position here. In reaching this conclusion, we have considered HUD's quite important argument that "because of the ease with which other counties and cities throughout the country could escape the mandate of integration by enacting similar regulations requiring 'community-ties' priorities in public housing, HUD vigorously opposes the plaintiffs' theory that they are entitled to first priority." Memorandum of Law at 6. The impact of our ruling is of natural concern to HUD which has national responsibilities in fulfilling the affirmative action requirements of the statute. We do not believe, however, that our ruling necessarily compels a similar conclusion on the different state of facts implied in HUD's expression of concern; to the contrary, we believe that, should HUD or a Housing Authority attempt to assert affirmatively that community ties should be given an absolute priority where the result was to *exclude* minority group members from publicly assisted housing, an entirely different reaction would be called for by the courts. This situation, however, is not the one with which we are faced and we believe that our interpretation is proper in regard to the facts before us.

Furthermore, HUD clearly has the power to protect the interest which it fears is threatened here. To prevent misuse of this type of regulation, it can restrict or prohibit its adoption by local agencies under its jurisdiction. Our decision does not require any housing authority to grant a priority to former site occupants. We merely hold that, having undertaken to do so, the Housing Authority, here, must abide by its decision.

The conclusion reached here is less drastic than at first appears in view of some of the facts recited earlier in this opinion. It is noteworthy, for example, that, if plaintiffs' first priority is respected, the entire urban renewal complex, of which the two buildings in question are a component, will nonetheless be 73% white by family. Furthermore, the surrounding area is integrated, with approximately even proportions of whites and non-whites. (Golar affidavit in opposition to motion for summary judgment, par. 16.) Finally, the situation is not one in which an influx of non-whites may provoke the "tipping" of a previously integrated neighborhood, since by definition former site occupants are persons who originally resided in the neighborhood. , Accordingly, we do not foresee that in this situation the first priority accorded former site occupants will result in further ghettoization of the Lower East Side, regardless of what the result might be in a different context.

Moreover, we agree with the court in *Shannon* when it stated:

"Nor are we suggesting that desegregation of housing is the only goal of the national housing policy. There will be instances where a pressing case may be made for the rebuilding of a racial ghetto. We hold only that the agency's judgment must be an informed one; one which weighs the alternatives and finds that the need for physical rehabilitation or additional minority housing at the site in question clearly outweighs the disadvantage of increasing or perpetuating racial concentration." 436 F.2d at 822; *accord,* Gautreaux v. Romney, 448 F.2d 731, 740 (7th Cir. 1971).

Of the many possible alternatives open to the Housing Authority, it has adopted, and must now abide by a course which is entirely reasonable under the circumstances.

Finally, to the extent that the Housing Authority is depriving plaintiffs of a governmental benefit to which they are entitled (by virtue of the regulation) solely because they are non-white, its action, as found by Judge Frankel, violates the Equal Protection Clause, runs afoul of federal statutes prohibiting racial discrimination in federally assisted programs (*e. g.*, 42 U.S.C. §§ 2000d and 3604) and violates the Supremacy Clause. 344 F.Supp. at 746.

## VI.

Defendants contend that, whatever conclusion we may reach as to the other issues in this case, defendant-intervenors must nonetheless prevail, because the Fair Housing Act of 1968 deprives us of the power to enjoin the enjoyment of their leases. The applicable section, 42 U.S.C. § 3612(a), provides:

"The rights granted by . . . this title may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy . . . [P]*rovided, however,* That any sale, encumbrance, or rental consummated prior to the issuance of any court order issued under the authority of this Act, and involving a bona fide purchaser, encumbrancer or tenant without actual notice of the existence of the filing of a complaint or civil action under the provisions of this Act shall not be affected."

Plaintiffs argue that this section is inapplicable, because the challenged leases were not consummated, within the meaning of the statute, prior to the issuance of a temporary restraining order in April, 1972, and, indeed, are not consummated now, since, they contend, consummation under the statute requires possession.[15]

Federal courts are mandated " 'to adjust their remedies so as to grant the necessary relief' where federally secured

15. Plaintiffs have also raised the issue whether the leases are valid under applicable state law. Our disposition of the statutory question makes it unnecessary to discuss their alternative ground.

rights are invaded." J. I. Case Co. v. Borak, 377 U.S. 426, 433 (1964). *See also* Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Brown v. Board of Education (II), 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). An abrogation of this essential and inherent power can only result from the clearest indication of Congressional intent. The words of the Supreme Court, in Hecht Co. v. Bowles, 321 U.S. 321, 329–30, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944), are eminently appropriate here:

> "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. We do not believe that such a major departure from that long tradition as is here proposed should be lightly implied."

Far from finding a clear indication that Congress intended § 3612(a) to apply to a case such as this, what legislative history there is seems to support the contrary position. Senator Allott, who proposed the *proviso* to § 3612(a), described "what this amendment is intended to do" as follows:

> "In a situation where a bona fide purchaser has . . . leased property, without knowledge of a complaint or civil action, *and is actually in possession* as a bona fide holder or purchaser, that he will not be thereafter injured by reason of any court order or court authority. This is stating the situation about as simply and plainly as I think it can be stated." 114 Cong.Rec. 4987 (emphasis added).

Further comments by Senator Mondale indicate that the purpose of the amendment was to "[protect] the sanctity of our recordation procedures." *Id. See also* 114 Cong.Rec. 4978–4979. In other words, the Allott amendment was passed in order to ensure that court action, prior to the issuance of an order, would not be deemed constructive notice to a bona fide purchaser who records his interest or who avails himself of the accepted substitute for recordation—possession, giving actual notice to subsequent purchasers. In the case at hand, defendant-intervenors have neither recorded their leases [16] nor taken possession. Thus, they do not come within the purview of § 3612(a).

We believe, moreover, that this determination is the equitable one in the circumstances. Although defendant-intervenors will naturally feel keen disappointment at the invalidation of their leases, they have taken no action in reliance on them and will not be left in a worse position than they were prior to the transactions. Plaintiffs, on the other hand, permitted themselves to be relocated from their homes in reliance on express promises that they would be allowed to return. As Judge Frankel stated:

> "Persons like the plaintiffs could have chosen to forego 'temporary' public housing had they been told the price would be effective banishment from their old neighborhood. They had no occasion to weigh that possible course because they were led to understand no such difficult choice was necessary." 344 F.Supp. at 743.

Moreover, theirs are the federally-created rights which, despite the promptest possible action on their part, we would be unable to protect if we accepted defendants' interpretation of § 3612(a).

Finally, enforcement of the Fair Housing Act would be severely hampered by immunizing all leases from judicial con-

---

16. In fact, it is possible that defendant-intervenors' leases are not subject to the recordation statute, since, if they are for less than three years, they are not a con-

veyance of an interest in land for purposes of the recording act. N.Y.Real Prop.L. § 290(3) (McKinney 1968), McKinney's Consol.Laws, c. 50.

trol. We believe that this result is not required or intended by the statute.

## VII.

Because of our resolution of the other issues in this case, decision of the question whether the "house of worship" transfers violate the Establishment Clause is no longer essential to the disposition of this case. However, since the issue has been briefed and argued at length some comments appear in order.

The "house of worship" transfers involve forty-eight intervenor-defendants who were granted transfers to Seward Park Extension from other projects in order to be close to a synagogue situated across the street from one of the buildings. The transfers were accomplished pursuant to paragraph 6 of SP 047:48:4 which provides that "[r]equests for transfer for case reasons may be considered on an individual basis and approved only after careful examination of the facts." (Exhibit F to Golar affidavit opposing application for preliminary injunction.) Irving Wise, the Housing Authority's Director of Management, interpreted the regulation to include as a "case reason" the applicant's need to be within walking distance of his place of worship. (Transcript at 76–82.) The Housing Authority maintains that these transfers are valid because in their present locations the transferees are harassed and physically abused on their way to synagogue and the Housing Authority has a valid interest in the safety of its tenants, which these transfers are intended to promote.

■ There can be no doubt that the allocation of government benefits on a religious basis infringes the proscription of the Establishment Clause. Defendant-intervenors argue, however, that the situation before us exemplifies the necessity of mitigating the demands of the Establishment Clause in order to accommodate the exigencies of the Free Exercise Clause.

■ Courts have often been faced with the necessity of finding "a neutral course between the two Religion Clauses" in situations where an absolutist approach would lead to a clash between them. Walz v. Tax Commission, 397 U.S. 664, 668–669, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). However, this delicate maneuver becomes necessary only when a clash is actually threatened, and no such danger is present here. Even accepting defendant-intervenors' description of their admittedly sorry plight in being unable to make their way to and from synagogue unmolested, the Housing Authority is of course not obligated to protect them from their menacing surroundings by providing them with apartments near their place of worship. The First Amendment does not require government to ensure a citizen's free exercise of his religion; rather it restrains government from interference with that free exercise and the amendment establishes a negative prohibition, not a mandate for affirmative action. Here, there may well be interference with defendant-intervenors' free exercise of their religion, but there is no conceivable *governmental* interference with it, and, hence, no violation of the Free Exercise Clause.

■ As a result, this is not a case in which "the actions absolutely proscribed by the Establishment Clause . . . could be constitutionally justified . . . out of the necessity of preserving the right to free exercise of religion." Anderson v. Laird, 466 F.2d 283, 290 (D.C. Cir. 1972), cert. denied, 404 U.S. 865, 92 S.Ct. 68, 30 L.Ed.2d 109, 41 U.S.L.W. 3346 (Dec. 19, 1972) (footnote omitted). We find, as did Judge Frankel, that the use of religious criteria in the assignment of an apartment is a violation of the Establishment Clause of the First Amendment, "the basic purpose of . . . which is to insure that no religion be sponsored or favored. . . ." Walz v. Tax Commission, supra, at 669, 90 S.Ct. at 1411. Apartments in New York City are a scarce commodity. By giving some persons apartments because they are religious Jews, the Housing Authority deprives others because they are not Jew-

ish.[17] Even assuming a willingness on the part of the Housing Authority to make the same concessions to the needs of members of other churchgoing sects, the "house of worship" transfers would still favor believers over non-believers and churchgoers over persons who worship at home. Thus they "aid one religion, aid all religions, [and] prefer one religion over another" in violation of the Establishment Clause. Everson v. Board of Education, 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947).

## VIII.

■ We turn finally to the federal defendants' motion for summary judgment dismissing the complaint as to them. The relief which this opinion affords plaintiffs against the Housing Authority renders moot their claims against the federal defendants.[18] Accordingly, the motion for summary judgment dismissing as to HUD and Romney is granted.

The complaint seeks to enjoin the federal defendants to ensure by affirmative action that the Housing Authority 1) ceases and desists from racial discrimination in the renting of apartments in Seward Park and 2) follows its regulation according plaintiffs a first priority to the apartments. As a result of this decision, the Housing Authority will be ordered to follow its priority regulation, which, as interpreted by this court, does not discriminate against plaintiffs in any way. Since full relief can be obtained from the Housing Authority, there is no necessity or reasonable basis for granting injunctive relief as to HUD and Romney and the complaint is therefore dismissed as to them.

## IX.

In sum, the New York City Housing Authority is permanently enjoined 1) from renting any apartments in its Seward Park Extension buildings to any individual or family unless and until all former site occupants, who are eligible (without regard to housing need) and have applied for and for whom there is an apartment of appropriate size, are offered leases in the building; 2) from allowing any individuals or families who are not former site occupants to whom it has rented apartments in the Seward Park Extension buildings from taking possession of the apartments unless and until all former site occupants, who are eligible (without regard to housing need) and have applied for and for whom there is an apartment of appropriate size, are offered leases in the buildings; and 3) from leasing apartments on a priority basis to persons seeking proximity to their house of worship. Intervenor-defendants' leases are declared null and void to the extent that they interfere with the Housing Authority's ability to accommodate former site occupants, as

---

17. The fact that granting apartments to some takes them away from others distinguishes this case from situations where the state provides services to all its citizens or all members of group, regardless of religious affiliation, as, for example, fire and police protection, school busing (Everson v. Board of Educ., 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947)), and textbooks (Board of Educ. v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968).

18. This case is distinguishable from Gautreaux v. Romney, 448 F.2d 731 (7th Cir. 1971), in which the court refused to dismiss for mootness despite entrance of an order granting substantially complete relief against the local Housing Authority.

In Gautreaux, Romney and HUD were charged with past acts of racial discrimination which warranted a declaratory judgment against them, whereas, here, plaintiffs seek relief for the future which can be fully satisfied by a decree against the Housing Authority alone. Moreover, here, no claim is made that HUD has affirmatively violated the Act whereas the Gautreaux court found that it had. Id. at 739.

Our decision as to mootness makes it unnecessary to consider the federal defendants' contention that failure to exhaust administrative remedies bars plaintiffs' claim against them. As to its other argument, we agree that HUD's adoption before this court of the Housing Authority's position does not constitute discrimination against plaintiffs.

**958**

indicated above. Intervenor-defendants
are determined to be a class consisting of
171 persons who are not former site oc-
cupants and to whom the Housing Au-
thority has leased apartments in the
Seward Park Extension buildings. The
complaint is dismissed as to HUD and
Romney.

Submit order on notice.