Francisco **OTERO** et al., Plaintiffs-Appellees,

v.

**NEW YORK CITY HOUSING AUTHORITY** et al., Defendants-Appellants.

Akiva **Miller** et al., individually and on behalf of all others similarly situated, Intervening-Defendants-Appellants.

Nos. 1027, 1028, 1029, Dockets 73–1462, 73–1499, 73–1503.

United States Court of Appeals, Second Circuit.

Argued June 5, 1973.

Decided Sept. 12, 1973.

**1124**

Jeanne Hollingsworth, Atty., New York City (Otto M. Bonaparte, Gerald Davis, Aaron Kohn, Raphael Samuel, New York City, of counsel) for defendant-appellant New York City Housing Authority.

Nancy E. LeBlanc, Atty., New York City (George C. Stewart, Martin A. Hotvet, MFY Legal Services, Inc., New York City, of counsel) for plaintiffs-appellees.

Kalman Finkel, New York City (Leon B. Polsky, Helaine Barnett, Atty., The Legal Aid Society, New York City, of counsel) for intervening-defendants-appellants.

Nathan Lewin, Washington, D. C. (Howard I. Rhine, Harvey Blitz, New York City, Dennis Rapps, National Jewish Commission on Law and Public Affairs (COLPA), Brooklyn, N. Y., of counsel) for intervening-defendants-appellants John Doe, and others.

Before HAYS, MANSFIELD and MULLIGAN, Circuit Judges.

MANSFIELD, Circuit Judge:

Upon this appeal we encounter a type of confrontation that sometimes occurs when a housing authority's use of low cost public housing to promote or maintain racial integration clashes with other demands or interests in the community. Usually the problem arises when an effort is made to introduce a non-white minority into a community that is populated almost entirely by white residents. See N. Y. Times Feb. 17, 1972, 1:1 re: Forest Hills Housing Project, Queens, and Nov. 21, 1972, 1:1 re: Kawaida Towers Housing Project, Newark; Crow v. Brown, 332 F.Supp. 382 (N.D.Ga. 1971); Gautreaux v. Chicago Housing Authority, 296 F.Supp. 907 (N.D.Ill. 1969), affd., 436 F.2d 306 (7th Cir. 1970), cert. denied, 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971); Banks v. Perk, 341 F.Supp. 1175 (N.D. Ohio 1972). Here, however, the context is one in which the community is presently integrated, with a racial balance that is almost equally divided between white and non-white residents, but the housing authority seeks to stem a steady decline in the percentage of the white population in the community.

The primary issue is whether the New York City Housing Authority ("the Authority" herein), in selecting tenants for a public housing project on the Lower East Side, was required to adhere to its regulation, which would give first priority to present and former occupants of the urban renewal site upon which the project was constructed, despite its contention that the effect of adherence to its regulation would be to create a non-white "pocket ghetto" that would operate as a racial "tipping factor" causing white residents to take flight and leading eventually to non-white ghettoization of the community. See Gautreaux v. Chicago Housing Authority, *supra;* Kap-

lan, Equal Justice in an Unequal World —The Problem of Special Treatment, 61 N.W.L.Rev. 363, 388–98 (1966). The district court held that, although the Authority was under a constitutional and statutory duty to foster and maintain racial integration, this duty could not as a matter of law be given effect where to do so would be to deprive a non-white minority of low cost public housing that would otherwise be assigned to it under the Authority's regulation. It therefore granted summary judgment in favor of the plaintiffs.

We disagree as to the district court's interpretation of the Authority's duty to integrate. We do not view that duty as a "one-way street" limited to introduction of non-white persons into a predominantly white community. The Authority is obligated to take affirmative steps to promote racial integration even though this may in some instances not operate to the immediate advantage of some non-white persons. It was entitled to show that adherence to its regulation would conflict with this duty. We further find that a genuine dispute exists as to various -material facts, including certain facts relied upon by the district court as the basis for its finding that adherence to the regulation would not "result in further ghettoization of the Lower East Side." Accordingly we reverse and remand for further proceedings not inconsistent with this opinion.

### I.

The background of this appeal is set forth in the decisions of Judge Frankel granting preliminary relief to the plaintiff class, 344 F.Supp. 737 (S.D.N.Y. 1972), and of Judge Lasker granting permanent relief on plaintiffs' motion for summary judgment after a limited hearing more fully described *infra*, 354 F.Supp. 941 (S.D.N.Y.1973). We therefore restrict ourselves to a summary of those facts and proceedings necessary to an understanding of our decision.

Two apartment buildings containing 360 apartments for low income tenants are the immediate subject of dispute in this case. They were designed by and built for the Housing Authority, with the assistance of federal funds, to be part of a larger complex of low and middle income housing to be constructed on the site of the Seward Park Extension Urban Renewal Area which covers approximately 14 square blocks located on the Lower East Side of Manhattan ("Urban Renewal Area" herein). Overall supervision of the Urban Renewal Area is the responsibility of New York City's Housing and Development Administration ("HDA" herein). In addition to the two low income buildings, construction of three buildings comprising 600 middle income units is in the process of being completed.

The City of New York obtained title to the Urban Renewal Area on November 1, 1967. HDA proceeded to relocate the 1,852 families who lived there to other housing, many of them to public housing on the Lower East Side. These families were told at the time of their relocation that they would have a first priority to return to the buildings to be built on the site they were leaving. Although only 55 of these 1,852 families moved from the actual portion of the site on which the Authority's two-building project was constructed, all the families were given the assurance of first priority to return. Again, when the two buildings were nearing completion in January, 1972, and the process of leasing the 360 apartments they contained was commenced, HDA wrote to the class of urban renewal site residents, not just the 55 families who were project site residents,[1] notifying them that "all present [2] and former residential tenants

---

1. We adopt the terminology used by Judge Lasker, which describes the 1,852 families relocated from the overall Urban Renewal Area as "urban renewal site residents," those 55 families relocated from the site of the Housing Authority's project as "project

site residents," and both groups considered together as "former site occupants." 354 F.Supp. at 944 n.4.

2. Some families were initially relocated in holding buildings on part of the Urban Re-

of Seward Park Extension will be given first priority to return to *any* housing built *within this urban renewal area* provided they meet certain qualifications [of income, family size, etc.]." (Emphasis supplied.) They were also notified that if they were already living in public housing, they would have to apply for a transfer at their present project and notify the field office at the Seward Park Extension project of their intention to transfer.

The response by former site occupants to the invitation to return to the Authority's buildings in the Urban Renewal Area was much larger than anticipated. Experience had indicated that normally only 4% of those relocated from such an area would apply for return to the new housing constructed on it. In this case, however, 27% applied for apartments in the Authority's two buildings. Of the 360 available apartments, 161 were leased to former site occupants (15 to project site residents and the balance of 146 to urban renewal site residents). Three hundred twenty-two more applications from former site occupants were not honored. Instead, the Authority proceeded to lease or commit 171 apartments to the defendants-intervenors, who were not former site occupants.[3] Former site occupants who inquired

were told that the apartments were filled, or given no response at all. Of these 171 families, 48 were allowed to transfer from other public housing because of the proximity of the Seward Park Extension buildings to an historic synagogue at which they worshipped.

When those former site occupants (mostly non-white) who had applied for but were denied apartments discovered that the 171 apartments had been committed to others (mostly white) in disregard of the Authority's representation that former site occupants would have first priority, they filed a complaint on April 27, 1972, against the Authority and the Department of Housing and Urban Development ("HUD" herein) on behalf of a purported class of non-whites[4] seeking admission to the Seward Park Extension project, including not only those who were former site occupants but also those in emergency need of housing or in overcrowded public housing elsewhere on the Lower East Side. The complaint, invoking federal question jurisdiction, was based on 42 U.S.C. §§ 1981, 1982, 1983, the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the Fair Housing Act of 1968, 42 U.S.C. §§ 3604, 3608. It sought to prevent the Authority from renting to persons other than former site occupants until all in that

---

newal Area site while other parts were being cleared. The record does not disclose whether some are still residing in these temporary quarters, but for purposes of the priority asserted in this case the place of relocation is irrelevant, and all occupants of the site at the time the City took title, whether presently on part of the urban renewal site or relocated elsewhere, are described by the same categories defined in note 1, *supra*.

3. When this action was commenced, 26 apartments had not yet been rented and 2 had been rented to resident employees. The latter are not disputed. Disposition of the 26 apartments, which the Authority is presently enjoined from renting, and of the 171 apartments leased or committed to persons who were not former site occupants, will depend on the ultimate outcome of this lawsuit. There is some confusion between the parties as to the number of leases already granted or committed to those who are and those who are not former site occupants.

Plaintiffs say that 161 former site occupants were given leases and 171 families not in that category received leases or commitments; defendants assume the numbers to be 162 and 170, respectively. We will use the former figures for convenience, since they were used by Judges Frankel and Lasker.

4. Throughout this action, the term "non-white" has been consistently used to include Puerto Ricans, who in fact make up most of the plaintiff class, in addition to blacks and orientals. While racial definitions for the purpose of considering what constitutes "integration" may be somewhat more difficult, and unhappily must be considered, we adhere to the plaintiffs' dichotomy between "whites" and "non-whites" and to the definition of "non-whites" they employ for purposes of this appeal only. Cf. Keyes v. School District No. 1, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

category who were eligible for public housing and for whom there were appropriate apartments had been accommodated. The complaint also sought to prevent the Authority from discriminating against non-white persons in the renting of any apartments which might be available after all former site occupants were housed, and to compel HUD to insure that the Authority would follow its regulation and would cease all discriminatory practices in renting apartments in the Seward Park Extension buildings.

On the day the complaint was filed the late Judge McLean issued a temporary restraining order to preserve the status quo since the buildings were not yet ready for occupancy. Plaintiffs then moved for a preliminary injunction before Judge Frankel who found, 344 F. Supp. 737, that the Authority's regulation GM 1810,[5] on which plaintiffs based their claim, was applicable and gave plaintiffs a first priority on the apartments in dispute, despite the Authority's contention that it did not apply to persons who had been relocated to other public housing. He concluded that the Authority's failure to abide by its regulation deprived the former site occupants of due process and that, because its action resulted in "a racially discriminatory pattern of admissions," though it did not have that purpose, it denied them equal protection of the laws as well. The transfers granted to the 48 Jewish families to be closer to their synagogue were found to be in violation of the Establishment Clause of the First Amendment.

On June 6, 1972, two days before Judge Frankel entered an order in accordance with his opinion, the Authority raised for the first time the issue of the effect of Judge Frankel's decision on the racial balance in the project, claiming that the result of the decision might be to violate the Authority's duty to prevent segregation in public housing.[6] The Authority also pointed out that those persons to whom it had made commitments for apartments but who were not former site occupants wanted to be heard on the question of whether their leases could be abrogated to meet the requirements of the decision.

Judge Frankel's order of June 8 enjoined the Authority from allowing any families other than former site occupants to take possession of the apartments, provided that once the former site occupants were fully accommodated in accordance with the regulation, as construed, the Authority could allow rental or occupancy by other applicants. The order also defined the plaintiff class to comprise "all site or former site occupants of the Seward Park Extension Urban Renewal Area."

On June 23 Judge Gurfein granted motions to intervene as defendants by Akiva Miller, representing the class of 171 families who are not former site occupants and to whom the Authority had leased or committed[7] apartments in the

5. General memoranda of the Housing Authority, or "GMs," embody policy determinations translated into staff directives. See 354 F.Supp. at 944 n.5. GM 1810 is entitled "Regulations of the New York City Housing Authority Governing Admission to Public Housing" and is reprinted in full as an appendix to Judge Frankel's opinion at 344 F. Supp. 748–749.

6. Apparently the Authority, perhaps not anticipating the direction of Judge Frankel's decision, had not previously considered this legal conflict. The Chairman of the Authority, Simeon Golar, stated in his affidavit of May 16 in opposition to the preliminary injunction that the "Authority without exception processes applications for public housing without reference to race. The ethnic identity of the applicant is not noted until after an apartment is rented." Such a practice would, of course, be incompatible with assuring that tenant selection did not result in segregated housing.

7. The intervening class itself points out that of the 170 families Miller claims to represent, note 3, *supra*, 131 have signed leases and have paid one month's rent as security, 17 have signed leases only, and 22 have just a letter of commitment for a lease signed by the Housing Authority. Brief 10. Class status was confirmed by Judge Lasker in the order appealed from for the 171 families.

Seward Park Extension buildings, and by John Doe, representing the sub-class of 48 families who were transferred to these buildings to be near their synagogue. Both groups, which had not been named as defendants and had not been represented in the proceedings for preliminary relief before Judge Frankel, simultaneously filed answers with their motions for permission to intervene. The Authority filed its answer on June 30.

On August 29, 1972, plaintiffs moved for summary judgment. Upon the affidavit of the Chairman of the Housing Authority, Simeon Golar, in opposition to the motion, the Authority itself cross-moved on October 6 for summary judgment in its favor or, in the alternative, for a trial of certain issues of fact it claimed to be in dispute, including (1) whether the Authority had properly considered, in leasing the apartments, the "underlying racial factors in accordance with constitutional, federal, statutory and regulatory requirements," and (2) whether the regulations granting priority to former site occupants "give a right to return to a particular project or merely a top priority for admission to public housing generally." Defendant HUD moved for summary judgment on October 13 for failure of the complaint to state a claim against the federal defendants since HUD did not approve GM 1810 and was not required to do so. Finally, the intervening defendants moved for summary judgment on October 24, generally supporting the Authority's position that to grant first priority of return to former site occupants would violate its constitutional and statutory duty to prevent racial imbalance in the project and in the surrounding community. With respect to the 48 Jewish families who were transferred closer to their synagogue, the intervenors contended that the transfers did not violate the Establishment Clause. Lastly the intervenors claim that in any event 42 U.S.C. § 3612(a) prevented the court from nullifying their leases because they had been granted prior to the commencement of

the action and without notice of any discriminatory action on the part of the Authority.

With all parties having moved for summary judgment, Judge Lasker directed that a hearing be held with respect to certain factual issues. According to the defendants, the hearing was to be devoted solely to clarifying the meaning and application of the Authority's regulation governing the first priority. At the hearing on December 21, 1972, however, Judge Lasker told the parties that plaintiffs' reply memorandum had raised other possible factual disagreements. In our view some of these, discussed below, are of material significance and call for a remand.

The parties did not dispute the following facts, which Judge Lasker accepted: (1) that 60% of the 1,852 urban renewal site residents who had been relocated were non-white, (2) that of the 161 leases granted to former site occupants 60% went to non-white families and 40% to white families, while the 171 leases granted or committed to intervenors were divided 12% non-white and 88% white, and (3) that if plaintiffs prevailed, the project would become 80% non-white to 20% white by family, whereas if defendants prevailed, the ratio would be 40% non-white to 60% white by family and closer to 50-50 by population. However, an issue is raised as to certain facts stated in plaintiffs' reply memorandum and accepted by Judge Lasker. Plaintiffs stated that even if they should prevail and the *project* should be made up of 80% non-white families, the 14 square block Seward Park 'Extension Urban Renewal Area as a whole, when completed, would "in all probability" become 73% white by family in view of the large amount of moderate income housing and housing for the elderly that was planned for the remainder of the urban renewal site. Conversely, the memorandum asserted that if the defendants prevailed, the number of non-white families in the Urban Renewal Area, when finally constructed, would be reduced to 18%. On

the basis of this factual prognostication plaintiffs argued that if the Authority honored its first priority regulation it would "assist in integrating what [would] otherwise be a heavily white neighborhood."

At the outset of the hearing Judge Lasker pointed to these assertions which defendants now vigorously dispute and asked defendants to comment on them or be prepared to argue in answer to them. Recognizing that he had "thrown quite a number of extra items into the hopper," he allowed a recess, following which counsel for the Authority stated that "since these questions are a surprise to us and open up a whole new area of inquiry, we would like to reserve our rights to this area of inquiry, and if necessary have an additional hearing on it," and further that if the testimony adduced at the hearing were insufficient, "we would ask that it be deferred to a subsequent date." Though the testimony fully explored the meaning and applicability of the Authority's regulation, it did not probe into the accuracy or inaccuracy of the statistics cited in plaintiffs' reply memorandum. Nor did the parties adduce evidence as to certain facts which we consider to be material and relevant in determining whether application of the regulation would have prevented the Authority from carrying out its affirmative duty to integrate.[8]

Although defendants did not present any evidence specifically addressed to the plaintiffs' now disputed claims, and the Authority rested, at the end of the hearing, on the documents and papers submitted and the testimony given, the Authority now states that when it inquired of the court by telephone after the hearing whether additional information would be required, it was advised that it would be notified but that it never received any notification. Defendants assert that Judge Lasker erred in assuming that the plaintiffs' figures were correct and in granting summary judgment in their favor, in at least partial reliance on the questioned statistical projections of the racial composition of the Urban Renewal Area.

Judge Lasker filed his opinion on February 8, 1973, 354 F.Supp. 941. The opinion adopted, by way of background, the projections found in plaintiffs' reply memorandum that the Urban Renewal Area would still be 73% white by family even if plaintiffs prevailed and would be 82% white by family if defendants prevailed. He suggested therefore that "the potential impact of this decision on the racial mix of the urban renewal area as a whole is less drastic than the truly major consequences it will have for the parties and on the population make-up in the two contested buildings." *Id.* at 946. The decision held that GM 1810, which went into effect in 1968, governed priority of admission to the Seward Park Extension buildings. The opinion accepted the view, which had not been disputed, that the Fair Housing Act of 1968, 42 U.S.C. §§ 3601, 3608(d)(5), imposed a duty to act affirmatively to achieve fair housing on the Secretary of HUD and, through him, on local housing authorities administering public housing

---

8. Plaintiffs' counsel had also asserted in her reply memorandum that "while the racial compositions of the Lower East Side is 48.3% white—51.7% non-white . . . , the racial composition of the poor of the Lower East Side (i.e., of the class eligible for public housing) is approximately 30% white—70% non-white . . . which approximates the racial mix of the defendant Authority's projects on the Lower East Side." In addition, the memorandum noted that reliance on the "Authority's statistics showing declining white population [in its public housing projects in recent years] is fallacious because . . . while approxi-

mately half the families who leave are non-white, in filling vacancies the defendant Authority puts in about 84% non-white." The racial composition of the eligible public housing population is a factor to be considered in determining whether a given racial mix in a particular project would violate a housing authority's duty to take affirmative action to achieve integration, both within the project and within the relevant community of which it is a part. Defendants did not address themselves in the court below or here to this aspect of their duty to promote integration.

projects. However, Judge Lasker concluded nevertheless that affirmative action to achieve racially balanced communities was not permitted where it would result in depriving minority groups, in this case blacks and Puerto Ricans, of scarce public housing.[9] In view of his assumption that the Urban Renewal Area would be 73% white by family if plaintiffs won and the Authority's statement (in an affidavit of Simeon Golar) that the population of the surrounding area was approximately 48.-3% white, 51.7% non-white, Judge Lasker concluded that the situation was "not one in which an influx of non-whites may provoke the 'tipping' of a previously integrated neighborhood, since by definition former site occupants are persons who originally resided in the neighborhood," and therefore, that it was not foreseeable that according to former site occupants their first priority "will result in further ghettoization of the Lower East Side, regardless of what the result might be in a different context." *Id.* at 954.

Judge Lasker's opinion further concluded that the Authority had impermissibly participated in the establishment of religion by granting inter-project transfers to the 48 intervening families so that they could be closer to their synagogue. Finally, concerning relief, his opinion held that 42 U.S.C. § 3612(a)[10] did not deprive the court of the power to enjoin the enjoyment of the leases granted to the 171 intervenors, because they did not have physical possession of the apartments, a condition found by him to be essential to satisfy the requirement that a "rental" be "consummated" within the meaning of the § 3612(a) proviso.

Summary judgment was denied by the district court to all the defendants, save HUD,[11] and was granted in favor of the plaintiffs permanently enjoining the Authority from (1) renting any apartments in its Seward Park Extension buildings to any individual or family until all former site occupants who are eligible (without regard to housing need) and have applied for and for whom there is an apartment of appropriate size are offered leases in the buildings, (2) allowing any individuals or families who are not former site occupants, to whom it has rented apartments in those buildings, to take possession of the apartments unless all such former site occupants are offered leases, and (3) leasing apartments on a priority basis to persons seeking proximity to their "house of worship." In addition, he declared the intervenors' leases null and void to the extent that they interfere with the Authority's ability to accommodate former site occupants. From this order defendants appeal.

## II.

We have little difficulty in concluding that, subject to such overriding constitu-

---

9. Judge Lasker also found that, to the extent that the Authority is depriving former site occupants of a governmental benefit to which they are entitled under the first priority regulation "solely" because they are non-white, its action violates equal protection and federal statutes (e.g., 42 U.S.C. §§ 2000d, 3604) prohibiting racial discrimination in federally assisted programs. 354 F.Supp. at 954.

10. "§ 3612. Enforcement by private persons —Civil action; . . . prior bona fide transactions unaffected by court orders
   "(a) The rights granted by sections 3603, 3604, 3605, and 3606 of this title may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy

. . . *provided, however*, That any sale, encumbrance, or rental consummated prior to the issuance of any court order issued under the authority of this Act, and involving a bona fide purchaser, encumbrancer, or tenant without actual notice of the existence of the filing of a complaint or civil action under the provisions of this Act shall not be affected."

11. As to HUD, Judge Lasker concluded that since full relief could be afforded plaintiffs through an injunction against the Authority, and no claim was made of affirmative discriminatory action on HUD's part, the complaint against the federal defendants should be dismissed. 354 F.Supp. at 957 and n. 18. No appeal was taken from this ruling.

tional or statutory mandates as may exist with respect to racial integration, the Authority's regulation GM 1810 (rather than GM 1282) applies to this case. GM 1810, which was issued effective August 14, 1968, provides in pertinent part that "[p]riority in assignment of apartments is given to eligible applicants in the following order:

"1. site residents of the site upon which the project was built, and if the project is within an urban renewal area, model city area, or other redevelopment area, site residents of sites acquired to effectuate the plan for such area; . . . ."

Prior to this 1968 regulation, GM 1282 (first issued in 1962) governed priority of admission to public housing. It restricted the first priority to *project* site residents only. Since the City acquired title to the Seward Park Extension Urban Renewal Area in November, 1967, the Authority urges that the earlier regulation applies and that only those former site occupants who were relocated from the actual site of the present two-building project, rather than the larger group relocated from the entire Urban Renewal Area, are entitled to the first priority to return, and then only to the project built on the site of their former homes.[12] We disagree.

The Authority was not required to adopt any regulation giving first priority for admission to a particular public housing project to families it had relocated from the site. It did so voluntarily, out of a commendable desire to minimize the disruption inherent in urban renewal by enabling uprooted occupants to return to the site of their former homes. Nor was the Authority obligated to give former urban renewal site residents the benefit of GM 1810 in renting apartments in the Seward Park Extension project, since that project was planned and relocation was commenced prior to the issuance of GM 1810, at a time when only former project site residents were guaranteed by GM 1282 a first right of return. But, as Judge Lasker recognized, the Authority itself acted consistently as if the 1968 regulation, GM 1810, applied and treated it as controlling. Most of the former site occupants were relocated after the new, broader regulation had become effective. They all were assured by HDA representatives, who had coordinated with the Authority, that families displaced from the Urban Renewal Area would have the first right to return to housing constructed on the urban renewal site. Even more importantly, when the Authority in 1972 sent out invitations to former site occupants to return, reiter-

---

12. In the district court the Authority also argued that the first priority granted to former site occupants was limited to admission to public housing generally and not to any particular project. Judge Lasker rejected this argument and found that former site occupants were entitled, under either regulation, to return to a project subsequently built on the urban renewal site from which they had been relocated *without regard to* housing need and even if they presently resided in other standard public housing. This conclusion was based on the testimony and affidavits of Authority officials, the Authority's admitted practice of inviting *all* site residents, whether of the project site under GM 1282 or of the urban renewal site under GM 1810, and regardless whether they were then living in public housing or in substandard housing, to return to the completed projects. Furthermore, another regulation provided for inter-project transfers for former site

occupants, and the invitation to return, which was sent to all former site residents, included directions for making inter-project transfers. 354 F.Supp. at 948–950.

The Authority does not contest on appeal Judge Lasker's rejection of its argument that its first priority regulations entitle former site residents merely to relocation to public housing generally. Intervenors urge, however, that granting priority to former site residents who presently reside in standard housing at the expense of at least 73 intervenors who allegedly are living in substandard housing deprives the latter group of due process. However, since 260 plaintiffs presently reside in other public housing, each transfer of one of these plaintiffs from such other public housing to the Seward Park Project would presumably open up a new unit of public housing to which persons living in substandard housing may be admitted.

ating their entitlement to the first priority for admission to the new apartments, the notice was sent to *all* urban renewal site residents, even though only project site residents were sent such notices under the earlier regulation. Finally, of the 161 former site occupants who were actually given leases in the project, only 15 had formerly lived on the project site, whereas 106 had lived in the area but not on the project site. On the other hand, 40 families in the plaintiff class who formerly lived on the project site were nevertheless denied apartments in the two buildings.

■ In view of the Authority's disregard for its earlier regulation in actual practice, we would be closing our eyes to reality if we were to accept the view that only project site residents under GM 1282 and not urban renewal site residents under GM 1810 were entitled to the first priority for the apartments in the Seward Park Extension project. The undeniable fact is that the Authority proceeded under GM 1810. It was logical for it to have taken this course in tenanting the project in 1972, for more than four years had passed since its adoption of GM 1810. Having bound itself to that course in statements to plaintiffs, having publicly held itself out as prepared to follow that course with respect to this project and having in fact acted accordingly, it could not switch back in midstream to its earlier policy, even though it might have done so *ab initio*. See Vitarelli v. Seaton, 359 U.S. 535, 539–540, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). The Authority's failure to assert its current contention when it first began to process applications for the apartments, its advice to some inquiring former site occupants that the apartments were filled, and its failure to respond to other inquiries, all adds weight to the conclusion that plaintiffs were deprived of a gov-

ernmental benefit, i. e., a priority to specific public housing in their old neighborhood, without notice, hearing, or other due process of law. Plaintiffs had a right to rely on the Authority's regulation and representations. Under the circumstances the Authority was not entitled to disregard its own adopted procedure for offering apartments in the project in the absence of some overriding constitutional or statutory duty obligating it to do so.

### III.

Were the applicability of GM 1810 the only consideration in the Authority's choice of tenants for the Seward Park Extension buildings, our task would be completed. The Authority, however, points out that even if it would otherwise be bound to follow the first priority regulation as to all former site occupants, to do so in this instance would result in a racial composition in the two buildings of 80% non-white and 20% white by family. This result, the Authority asserts, is barred by the Constitution and by Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq.

Plaintiffs do not deny that the Authority has a duty to integrate under the 1968 Act. However, they contend, as Judge Lasker held, that the duty cannot be employed to deny non-whites housing. They further suggest that integration is achieved, in any event, when non-whites occupy 80% of a given project as well as when 80% of the project is white, particularly when Judge Lasker found that the Urban Renewal Area would probably be predominantly white overall and the Authority itself admits that the Lower East Side as a whole is 48% white. That overall figure, plaintiffs assert, will not be affected by adherence to the priority regulation since the plaintiff class will merely be transferring within the Lower East Side community.[13] De-

13. We assume, for purposes of our decision, that the relevant "community" for present purposes is that area delineated as the Lower East Side. However, upon remand the district court is not precluded from deciding, upon the basis of such proof on the issue as is received, that the community should be geographically defined otherwise.

fendants rejoin that large concentrations of non-whites in one or more pockets within the community would act as a "tipping" factor which would precipitate an increase in the non-white population in the surrounding neighborhoods, leading to a steady loss of total white population over a given period of time. It argues that it is under an obligation to prevent the formation of such concentrations or pockets of non-whites rather than limit itself to consideration of the overall current community proportions of whites and non-whites.

■ We agree with the parties and with the district court that the Authority is under an obligation to act affirmatively to achieve integration in housing. The source of that duty is both constitutional and statutory. Various discriminatory housing practices have been outlawed by judicial decree as violative of the Equal Protection Clause. An authority may not, for instance, select sites for projects which will be occupied by non-whites only in areas already heavily concentrated with a high proportion of non-whites. Shannon v. HUD, 436 F.2d 809 (3d Cir. 1970), noted in 85 Harv.L.Rev. 870 (1972). A tenant assignment policy which assigns persons to a particular project because of the concentration of persons of his own race already residing at the project has been prohibited. Gautreaux v. Chicago Housing Authority, 296 F.Supp. 907, 304 F. Supp. 736 (judgment order) (N.D.Ill. 1969), aff'd., 436 F.2d 306 (7th Cir. 1970), cert. denied, 402 U.S. 922, 91 S. Ct. 1378, 28 L.Ed.2d 661 (1971). An authority is barred from using assignment methods which seek to exclude, or have the evident effect of excluding, persons of minority races from residing in predominantly white areas or of restricting non-whites to areas already concentrated by non-white residents.

Crow v. Brown, 332 F.Supp. 382 (N.D. Ga.1971), affd., 457 F.2d 788 (5th Cir. 1972). Not only may such practices be enjoined, but affirmative action to erase the effects of past discrimination and desegregate housing patterns may be ordered. See Gautreaux v. Chicago Housing Authority, *supra*; Gautreaux v. Romney, 448 F.2d 731 (7th Cir. 1971); Crow v. Brown, *supra*; Fisher v. Parsons-Decaturville Authority, 70 Civ. 1998 (W.D.Tenn. Aug. 19, 1970) (judgment order). See also Kennedy Park Homes Ass'n v. City of Lackawanna, 436 F.2d 108 (2d Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); Dailey v. City of Lawton, 296 F.Supp. 266 (W.D.Okl.1969), aff'd., 425 F.2d 1037 (10th Cir. 1970); Heyward v. Public Housing Administration, 238 F.2d 689 (5th Cir. 1956).

■ An additional source of the affirmative duty to integrate is found in the 1968 Fair Housing Act ("the Act" herein) which provides that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States," 42 U.S.C. § 3601, and, in § 3608, that "(d) The Secretary of Housing and Urban Development shall . . . (5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this sub-chapter." It is true that the Act was designed primarily to prohibit discrimination in the sale, rental, financing, or brokerage of *private* housing and to provide federal enforcement procedures for remedying such discrimination so that members of minority races would not be condemned to remain in urban ghettos in dense concentrations where employment and educational opportunities were minimal.[14] However, we are satisfied that the affirmative duty placed on the Secretary

---

14. See the remarks of Senator Mondale, the chief sponsor of the fair housing portion of the Civil Rights Act of 1968, and others, set forth at 114 Cong.Rec. 2270–2284, and 3421–3426. In addition to these remarks there was extended debate in the House, mostly regarding other provisions of the 1968 Civil Rights Act and especially other aspects of Title VIII, 114 Cong.Rec. 9553–9621, but virtually none regarding the affirmative duties placed on the Secretary under § 3608(d)(5).

of HUD by § 3608(d)(5) and through him on other agencies administering federally-assisted housing programs also requires that consideration be given to the impact of proposed public housing programs on the racial concentration in the area in which the proposed housing is to be built. Action must be taken to fulfill, as much as possible, the goal of open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat. See, in accord, Shannon v. HUD, 436 F.2d 809 at 820–821 (3d Cir. 1970), noted in 85 Harv.L. Rev. 870 (1972); Banks v. Perk, 341 F. Supp. 1175, 1182 (N.D.Ohio 1972); Blackshear Residents Organization v. Housing Authority of City of Austin, 347 F.Supp. 1138 (W.D.Tex.1971). Senator Mondale, who drafted § 810(a) of the Act, 42 U.S.C. § 3610, pointed out that the proposed law was designed to replace the ghettos "by truly integrated and balanced living patterns." 114 Cong.Rec. 3422.

Judge Lasker recognized these mandates. However, he further concluded that because the primary intention of the Act's sponsors was to benefit minority groups, the affirmative duty to integrate public housing should not be given effect where it would deprive such groups of available and desirable housing. We disagree. Such a rule of thumb gives too little weight to Congress' desire to prevent segregated housing patterns and the ills which attend them. To allow housing officials to make decisions having the long range effect of increasing or maintaining racially segregated housing patterns merely because minority groups will gain an immediate benefit would render such persons willing, and perhaps unwitting, partners in the trend toward ghettoization of our urban centers.

There may be some instances in which a housing decision will permissibly result in greater racial concentration because of the overriding importance of other imperative factors in furtherance of national housing goals. But Congress' desire in providing fair housing throughout the United States was to stem the spread of urban ghettos and to promote open, integrated housing, even though the effect in some instances might be to prevent some members of a racial minority from residing in publicly assisted housing in a particular location. The affirmative duty to consider the impact of publicly assisted housing programs on racial concentration and to act affirmatively to promote the policy of fair, integrated housing is not to be put aside whenever racial minorities are willing to accept segregated housing. The purpose of racial integration is to benefit the community as a whole, not just certain of its members. In the absence of a history of deliberate discrimination against non-white persons, which would necessitate undoing the harmful effects, see, e. g., DeFunis v. Odegaard, 82 Wash.2d 11, 507 P.2d 1169 (1973) that objective cannot be achieved by adoption of a double standard under which low cost housing would be available to poor whites rather than to poor non-whites, or vice versa.

We are buttressed in our conclusion by the Supreme Court's recent decision in Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), which held that two tenants, one white and one black, had standing to sue under § 810 of the Act, 42 U.S.C. § 3610, to protest alleged racial discrimination against non-whites in the rental of apartments in the complex in which they already lived. The Court found that "the loss of important benefits from interracial associations" was a sufficient allegation of injury by existing tenants to meet the Court's standing requirements. It noted that "the proponents of the legislation emphasized that those who were not the direct objects of discrimination had an interest in ensuring fair housing, as they too suffered," and that the "person on the landlord's blacklist is not the only victim of discriminatory housing practices; it is, as Senator Javits said in

supporting the bill, 'the whole community,' 114 Cong.Rec. 2706."

■ We turn to the question of what effect the Authority's regulation GM 1810 has on its duty to integrate. In the absence of that regulation we would be inclined, in recognition of the Authority's presumed expertise in the administration of the Act, to be guided by the normal standard of review and to hold that its administrative decision could be reversed only for abuse of discretion or clear error judgment. Hanly v. Kleindienst, 471 F.2d 823 (2d Cir. 1972). Its determination that a certain racial mix in a given set of buildings is essential to promote integrated housing in the community would normally be entitled to great weight and those challenging it would bear the burden of showing that it represented an abuse of discretion. But the Authority's constitutional and statutory duty to promote integrated public housing, while paramount, does not automatically entitle it to disregard its own regulation. To the extent that the regulation conflicts with the Authority's duty to integrate, the regulation must yield. On the other hand, absent a showing of such conflict, the Authority may not disregard its regulation where the effect would be to violate the due process rights of former site residents who relied upon it. See Vitarelli v. Seaton, 359 U.S. 535, 79 S. Ct. 968, 3 L.Ed.2d 1012 (1959). Furthermore, since GM 1810 on its face appears to be neutral and to constitute a presumptively valid exercise of the Authority's discretionary power, the burden should properly be upon the Authority to show that its adherence to the regulation would in all likelihood result in a violation of its duties under the Constitution and the Fair Housing Act. That burden would not be satisfied by its showing that the ratio of white to non-white population, which it seeks for the two project buildings, falls within acceptable limits that are consistent with its duty to further integrated housing. It must also show that the segre-

gative effect of compliance with GM 1810 would be impermissible or, more specifically, that it would create a pocket ghetto of the type that would lead to a substantial increase in the overall non-white population in the community, precipitating a trend toward ultimate ghettoization of the entire community.

The "tipping point," or percentage of concentration of non-white residents in a given area that will cause white residents to flee, played a major role in Gautreaux v. Chicago Housing Authority, *supra*. It has been recognized by others.

"This gradual tendency of integrated areas to become more and more Negro is accentuated by the popular belief—often transmitted into action—that the rate at which white families move out rises with the percentage of Negroes in the area, and, more important, that there exists a 'tipping point' —a given percentage of Negroes, after which the departure of whites from the areas will be greatly accelerated." Kaplan, Equal Justice in an Unequal World—The Problem of Special Treatment, 61 Nw.U.L.Rev. 388 at 390 (1966).

"Tenancy in low income housing units tends to take on the racial character of the areas in which they are located. . . . Location of low income housing in a racially-mixed area, for example, while perhaps the most promising use of site selection for integrative purposes, must seek to minimize the market reaction to a new infusion of low income blacks. For if carelessly done, or even if a careful attempt is miscalculated, the large number of low income blacks potentially attracted to the housing may 'tip' the racial balance of a mixed area and cause white residents to move out." 85 Harv.L.Rev. 870 at 875–76 (1972).

However, to permit the Authority to take race, among other eligibility crite-

ria, into consideration in selecting tenants for public housing would, in the absence of a standard or regulation, allow it to engage in social engineering, subject only to general undefined control through judicial supervision. Absent convincing evidence that a color-blind adherence to GM 1810 would almost surely lead to eventual destruction of the racial integration that presently exists in the community, the Authority's denial of housing to a family because of its race could, whether or not labelled a "benign" quota, constitute a form of unlawful racial discrimination in violation of the family's constitutional rights. For these reasons the burden on the Authority is a heavy one. Before granting relief the district court must be satisfied that adherence to GM 1810 would probably lead to eventual ghettoization of the community.

The record before Judge Lasker already contains a great deal of undisputed evidence bearing on the effect of adherence to GM 1810. It appears to be accepted, for instance, that the Lower East Side has experienced a shift in the racial composition of its residents from a 58.9% white—41.1% non-white ratio in 1965 to a 48.3% white—51.7% non-white ratio in 1970, and that the public housing population of the Lower East Side, according to figures submitted to us, has been reduced from 62.7% white at initial occupancy of the housing projects to 20.3% as of January 1, 1972. (Ex D., App. 128a). Against this background the Authority argues that to allow the Seward Park Extension project to be occupied by 80% non-white families would violate its integration responsibilities, since such a non-white concentration would lead white persons in the immediate vicinity of the project to move away from the newly created "pocket ghetto" in accelerating numbers. In short, since the priority regulation would operate to tip the approximate 50–50 racial balance in the Lower East Side toward a non-white community, the Authority, relying on Banks v. Perk, *supra*, and Blackshear Residents Organization v. Housing Authority of City of Austin, *supra*, contends that it was entitled as a matter of law to disregard its own priority regulation in order to nip in the bud an incipient racial concentration.

Plaintiffs, on the other hand, argue that enforcement of the priority regulation will still permit racial integration to be maintained within the Lower East Side community. However, they rely on some disputed factual contentions, one of which appears to have been accepted by Judge Lasker. This was plaintiffs' projection in their reply memorandum of law to the effect that, even if they should prevail, the 14-block Seward Park Urban Renewal Area would be 73% white by family. The record shows that the defendants not only did not agree to this percentage figure but reserved the right, if necessary, to have an additional hearing on it. No such hearing was held. Defendants desire to offer evidence on this and other issues.

Plaintiffs further contend that the transfer of tenants from other projects in the Lower East Side to the Seward Park Project does not change the racial balance in the community, since it amounts merely to moving persons within the community without changing the overall percentages. Another argument advanced by plaintiffs is that the ratio of non-whites to whites that would result from strict adherence to GM 1810 is substantially the same as the ratio among the population eligible for low cost public housing, as distinguished from the total population of the Lower East Side. These contentions are disputed by defendants who argue that, given the opportunity to offer relevant proof, which was substantially precluded by the district court's grant of summary judgment in favor of the plaintiffs, they will develop facts from which it may reasonably be inferred that a concentration of non-whites in the two Seward Park Project buildings will act as a "tipping factor," leading to acceleration

of non-white predominance in the community. They further state, with respect to transfers of non-whites from other public housing in the community to the Seward Park Project, that the number of persons transferred from any one other project is too small to make any substantial change in the racial composition of the project of origin, whereas the concentration of non-whites in the new project will have an adverse impact on the racial balance in the surrounding area.

■ Thus we are confronted with genuine issues between the parties as to material facts bearing on the ultimate question of whether the non-white concentration in the two project apartments would have a "tipping" effect which the Authority was entitled, in the exercise of its duty to integrate, to avoid by suspending the operation of its priority regulation. Judge Lasker found it unnecessary to reach these issues, partly because of his conclusion that as a matter of law plaintiffs, as a minority group, could not be deprived of their priority rights through application of GM 1810, and partly because of his acceptance, without taking proof, of plaintiffs' projection that if they prevailed the Urban Renewal Area would be 73% white. However, since we disagree with his interpretation of the Authority's duty to integrate and with his acceptance of the disputed 73% figure, we conclude that the existence of a genuine dispute as to material facts rendered summary judgment an inappropriate procedure. A trial, at which the parties may offer evidence with respect to the relevant issues, is required. See Kennedy v. Silas Mason Co., 334 U.S. 249, 256–257, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948). At such a trial the parties would be permitted to offer evidence as to the relevant community, the impact of adherence to the priority regulation, including the declining white population in that community, the effect of transfers from other locations in the community to the Seward Park Project, estimates as to the total racial composition of the Urban Renewal Area upon completion, and the racial composition of the available population that is eligible for public housing. Such evidence should permit the trial judge to make findings as to whether adherence to GM 1810 would tend to precipitate a racial imbalance which might ultimately prevent the Authority from exercising its duty to maintain racial integration in the community.

## IV.

Two issues pressed by the intervening defendants remain for consideration. One is whether 42 U.S.C. § 3612(a) renders the district court powerless to interfere with the leases of intervenors even if it should conclude that plaintiffs should be accorded first priority for admission to the Seward Park Extension project apartments. The other is whether the district court erred in holding that the Authority, by granting the leases to the 48 Jewish families who were given transfers to that project because of its proximity to their synagogue, impermissibly established religion in violation of the First and Fourteenth Amendments.

Section 3612(a) provides that civil actions may be brought in the district courts without regard to amount in controversy to enforce "rights granted by sections 3603, 3604, 3605, and 3606," which outlaw racial and certain other forms of discrimination in the sale, rental, financing or brokerage of certain housing. The scope of such enforcement is limited, however, by a proviso that "any . . . *rental consummated* prior to the issuance of any court order issued *under the authority of this Act,* and involving a bona fide . . . tenant without actual notice . . . of the filing of a complaint or civil action under the provisions of this Act shall not be affected." (Emphasis supplied.) Plaintiffs argued successfully below that a "rental" was not "consummated" for

purposes of this section unless persons claiming its protection were in actual physical possession of the apartment. Intervenors reply that execution of the leases for the apartments and payment of a security deposit will suffice. Plaintiffs rejoin that the proviso excepts only consummated "rentals" and not consummated "leases."

There is no indication that the use of the term "rental" rather than "lease" was intended to impose the requirement of possession. Leases are usually considered to be "consummated" under New York law when the lease agreement is executed and a security deposit paid, see Schulman v. City of New York, 178 Misc. 593, 35 N.Y.S.2d 100 (Sup.Ct.), affd., 265 App.Div. 923, 39 N.Y.S.2d 612 (1st Dept. 1942), affd., 291 N.Y. 520, 50 N.E.2d 649 (1943). However, we need not decide whether these principles might under other circumstances be applied to protect those intervenors who signed leases and made security deposits, since plaintiffs brought this action not only under § 3612(a) to enforce the provisions of the Fair Housing Act but also under 42 U.S.C. §§ 1983, 2000d, and 28 U.S.C. § 1343(3). In fact, if relief were granted upon a finding that the Authority was required to follow its own regulation, it would be based on the due process rights of the plaintiffs and not on the violation of the Fair Housing Act. Similarly, if plaintiffs should prevail on the ground that the Authority had failed to show that its refusal to rent apartments to them because of their race was legally justified by its duty to integrate, they would be entitled to relief based upon denial of equal protection rather than upon violation of the Act. Thus plaintiffs could still possibly succeed, regardless of the Fair Housing Act, in maintaining their suit against the Authority under § 1983 for the deprivation of the constitutionally secured rights of due process and equal protection, or because of racial discrimination in denying them the benefits of a federally-assisted program under § 2000d. If the proof supported their claim, plaintiffs might qualify for full equitable relief under the provisions of Title VI of the 1964 Civil Rights Act. It is the Authority which relies for its position on the Fair Housing Act of 1968 to *defeat* the claims of the former site occupants. It cannot be said, therefore, that plaintiffs are seeking solely to enforce "rights granted by sections 3603, 3604, 3605, and 3606" of the Fair Housing Act so as to deprive them of the full, flexible relief which will normally be available to redress the invasion of "federally secured rights." See J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); see Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Hecht Co. v. Bowles, 321 U.S. 321, 329–330, 64 S.Ct. 587, 88 L.Ed. 754 (1944).

Finally, we turn to the question of whether, if the Authority can succeed in establishing that it was necessary to grant leases in the Seward Park Extension buildings to at least some of the white intervenors [15] in order to meet its affirmative responsibilities to foster integrated housing, it nevertheless would be barred from renting apartments in the project on a priority basis to some or all of the 48 Jewish families whom it would transfer from other housing projects so that they could live in close proximity to a particular landmark synagogue at which they worship.

Judge Lasker found that the Authority sanctioned the 48 transfers so that

15. There would appear to be no sound reason why non-white former site occupants should be denied their first priority in favor of those of the intervening class who are non-white if the only reason for denying the priority is to achieve a different racial balance. Nor must it necessarily be an "all or nothing" proposition whether the Authority is under an obligation to grant leases to some number of white intervenors to fulfill its affirmative obligations.

the families could be within walking distance of their place of worship, which was tantamount to "the use of religious criteria in the assignment of an apartment [in] violation of the Establishment Clause," 354 F.Supp. at 956. Accordingly, he enjoined the Authority "from leasing apartments *on a priority basis* to persons seeking proximity to their house of worship," *id.* at 957. (Emphasis supplied.) These families, however, urge that the Authority granted them the transfers for reasons of safety, because they had been subject to verbal and physical abuse on their way to and from their daily religious services, and not to assist them in their religious practices. They contend, accordingly, that the Authority's accommodation of their safety was not in violation of the Establishment Clause but was similar to the fire and police protection which all persons equally receive and which can properly be focused on places of worship if the need arises. See Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (provision of bus fares to enable children to get to public and parochial schools across the board); Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1938) (lending of secular school books to children attending public and private schools as part of a general program). Intervenors add that since they will be vacating other public housing to transfer to the Seward Park Extension Project, no loss of public housing will occur as a result of the transfers.

The purpose of the Establishment and Free Exercise Clauses of the First Amendment "is to insure that no religion be sponsored or favored, none commanded, and none inhibited." Walz v. Tax Commission, 397 U.S. 664, 669, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). No government, federal or state, can "pass laws which aid one religion, aid all religions, or prefer one religion over another." Everson v. Board of Education, *supra*, 330 U.S. at 15, 67 S.Ct. at 511.

While there are legitimate instances in which governmental authority has been allowed to be exercised impartially to allow religious persons to seek religious worship or instruction, see Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (public schools may release students during the school day to attend religious exercises or instruction of their own choice), such authority has never been allowed to be exercised on a preferential basis which would result in the application of religious standards to the distribution of finite governmental benefits.

Applying these principles to the present case, we conclude that it would be impermissible for the Authority to prefer persons of a particular faith for admission to a housing project in a preferred location if admission would otherwise go to others. If, on the other hand, the transfers were made solely on the basis of non-religious criteria, such as the personal safety of the transferees and the need to protect them against physical and verbal abuse, the fact that the transferees happened to be Jewish should not invalidate the transfers any more than would be the case if they were red-headed, blue-eyed, white, black, of foreign extraction, or possessed other non-religious characteristics which subjected them to harassment. Of course it would be preferable to incorporate the standard of personal safety in a clearly defined regulation rather than leave it to ad hoc determination, particularly since it is not difficult to visualize situations where persons of certain religious persuasions could be granted preferences under the guise of vague safety criteria. However, since an issue of fact has been raised as to the grounds upon which the 48 transfers were made in the present case we conclude that the defendants should be afforded the opportunity, upon remand, to show that the purpose was to assure the safety of the transferees rather than to accommodate their religious preferences.

**1140**

Conclusion

We affirm the district court's decision that, subject to the Authority's constitutional and statutory duty to effectuate racial integration in public housing, the Authority's regulation GM 1810 applies and entitles plaintiffs, as present or former site residents, to first priority in the assignment for rental of apartments in the Seward Park Extension buildings. However, we reverse the district court's decision that the Authority may not exercise its constitutional and statutory duty in a manner that will deny apartments to minority or non-white groups. We hold that to the extent that GM 1810 conflicts with the Authority's duty to integrate, the latter prevails and that the Authority may limit the number of apartments to be made available to persons of white or non-white races, including minority groups, where it can show that such action is essential to promote a racially balanced community and to avoid concentrated racial pockets that will result in a segregated community. Since GM 1810 is facially neutral and represents a presumptively valid exercise of the Authority's power, which would normally entitle former site- residents to priority, the Authority must bear the burden of making the required showing.

We affirm the district court's determination that 42 U.S.C. § 3612(a) would not bar it, if plaintiffs should otherwise prevail, from invalidating leases granted or committed to the intervenors. We reverse its determination that a grant of leases on a priority basis to certain persons would violate the Establishment Clause merely because it would relocate them to a point close to their place of worship and remand the matter for trial to determine whether the transfers were made for the purpose of protecting the physical safety of the transferees rather than to accommodate their practice of their religion.

The order of the district court is reversed and the case remanded for further proceedings not inconsistent with this opinion.